[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15065

_____

D.C. Docket No. 99-00370-CR-T-23-MSS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT MCCARRICK

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 18, 2002)

Before DUBINA, BARKETT, and KRAVITCH, Circuit Judges.

BARKETT, Circuit Judge:

Robert McCarrick appeals his convictions for one count of bank fraud, in

violation of 18 U.S.C. § 1344, and one count of making a false statement to a

government agency, in violation of 18 U.S.C. § 1001.[1] He argues that the

government failed to prove the necessary element of specific intent to defraud for

each of these crimes. We agree, and therefore reverse.

## BACKGROUND

McCarrick owned and operated an automobile repair business called Fleet

Maintenance Management ("Fleet"). On November 9, 1994, he applied to Liberty

Bank ("Liberty") for a loan of approximately $49,000, to be guaranteed by the

Small Business Administration ("SBA").[2] McCarrick told Liberty's loan officer

William McGrath that the purpose of the loan was to expand his business into fleet

maintenance repairs and auto body work. McCarrick stated on his loan

application[3] that he planned to use $35,000 of the loan to lease a new building for

his business and to purchase five specific pieces of equipment: a spray paint booth,

---

[1]McCarrick was sentenced to concurrent prison terms of one year and one day on each count, followed by 36 months of supervised release. He was also ordered to pay restitution to the Small Business Administration in the amount of $48,182.00.

[2]The SBA is a federal government agency that assists small businesses in obtaining financing by guarantying loans made to them by private banks.

[3]The loan application, which was signed on November 9, 1994, consisted of an informational "cover" page, and various comprehensive schedules on which McCarrick listed his planned purchases and lease, his existing indebtedness, and his assets. The application contained a certification provision, which McCarrick signed, that provided, "I hereby certify that all the information contained in this document and any supporting information provided to the lender or SBA is true and correct to the best of my knowledge." The application also contained a cautionary note, immediately above the certification provision, that stated, "If you knowingly make a false statement or overvalue a security to obtain a loan from SBA you can be fined up to $10,000 or imprisoned for not more than five years or both under 18 U.S.C. § 1001."

2

a frame machine, a tire machine, and two lifts.[4]  The remaining $14,000 was to be

used as working capital.  Along with his loan application, McCarrick submitted a

sale-proposal and acceptance for the equipment he was going to purchase, which

he had obtained from Terry McVittie, the owner of an auto equipment seller called

T.M. Distributing.[5]  McCarrick also submitted a proposed lease for $2,400 per

month that he had obtained for a garage.

Liberty and the SBA approved the $49,000 loan on November 29, 1994,

issuing a loan authorization.  At the closing, on December 23, McCarrick signed a

security agreement for the loan, a note promising to repay it, and a "Settlement

Sheet," upon which he certified that "there has been no adverse change in the

financial condition, organization, operations, or fixed assets [of Fleet], since the

application of this loan was filed."  McGrath gave McCarrick a check for $14,000

working capital, and a separate check, made out jointly to McCarrick and T.M.

Distributing for $24,712, which McCarrick immediately gave to McVittie to pay

for the tire machine, the lifts, and the frame machine.  One week later, on

---

[4]The tire machine is used to change and repair tires, and the lifts are used to raise vehicles aboveground for repair.  The frame machine and the spray paint booth are used for auto body work.  The two machines work in conjunction with one another; the frame machine straightens damaged vehicles and the spray paint booth is used to repaint vehicles after repair.

[5]The proposal lists various pieces of equipment, and a price for each.  It contains a provision, entitled, "Acceptance of Proposal," which McCarrick signed.  The provision states: "The above prices, specifications and conditions are hereby accepted.  You [McVittie] are authorized to do the work as specified.  Payment will be made as outlined above."

3

December 30, 1994, McCarrick received the remaining check for $12,679 to pay for the spray paint booth, which had been ordered but not yet delivered.

Upon receiving the check, McCarrick's girlfriend (who was working in Fleet's garage) endorsed the check for "T.M. Distributing Company," and signed Terry McVittie's name. McCarrick wrote "for deposit only" on the check, and deposited it into his business' bank account (i.e., Fleet's account).[6] McCarrick testified that he deposited the check into Fleet's account because the spray paint booth had not yet arrived, and that he intended to use the money to pay for the booth as soon as it came.

Over the next month, McCarrick's business experienced serious financial difficulties, and he canceled the order with T.M. Distributing for the spray paint booth, using the $12,679 instead to keep his business afloat. McCarrick testified that he remembered cancelling the order during the third week of January 1995.[7] McVittie testified that the cancellation was connected to the fact that McCarrick had difficulty obtaining the requisite permits for the installation of the booth. McCarrick's testimony was undisputed that he had standing orders for paint work

---

[6]McCarrick testified that McVittie had authorized him to deposit the check into Fleet's business account pending arrival of the spray paint booth. McVittie did not confirm or deny this, testifying only that he did not remember authorizing McCarrick to do so.

[7]McVittie testified that he did not remember when McCarrick canceled the order for the spray paint booth.

awaiting the spray paint booth, and the loss of this business contributed significantly to his business' decline, causing his subsequent cancellation of the order for the spray paint booth. McCarrick made his loan payments in January and February, but missed his payment in March 1995, and made no payments on the loan thereafter, though he was able to keep his business afloat until July.

The government charged McCarrick with one count of bank fraud and one count of making false statements to the government, and the jury found McCarrick guilty on both counts. McCarrick was sentenced to concurrent terms of one year and one day, plus three years of supervised release, and was ordered to pay restitution to the SBA in the full amount of the loan. McCarrick argues on appeal that the evidence adduced by the government was not sufficient to show, beyond a reasonable doubt, that he acted with specific intent to defraud the government at the time he signed the loan documents, as was required in order to convict him under 18 U.S.C. §§ 1001 and 1344. We review McCarrick's sufficiency of the evidence claim de novo, United States v. Giordano, 261 F.3d 1134, 1139 (11th Cir. 2001), resolving all reasonable inferences and credibility evaluations in favor of the jury's verdict, United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995). While we recognize that McCarrick shoulders a heavy burden in challenging the sufficiency of evidence supporting his convictions, we must nevertheless be

5

satisfied that, after drawing all permissible inferences in favor of government, the jury was rationally able to find that every element of the charged crimes was established by the government beyond a reasonable doubt.  See id.

## DISCUSSION

McCarrick was charged with, and convicted of, violating 18 U.S.C. § 1344 and 18 U.S.C. § 1001.  18 U.S.C. § 1344, entitled "Bank Fraud," provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice–
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Id.  Thus, to convict under § 1344(1), the government must prove (1) that the defendant intentionally participated in a scheme or artifice to defraud another of money or property; and (2) that the intended victim of the scheme or artifice was a federally-insured financial institution.  See United States v. Goldsmith, 109 F.3d 714, 715 (11th Cir. 1997).  To convict under § 1344(2), the government must prove (1) that a scheme existed to obtain moneys, funds, or credit in the custody of a federally-insured bank by fraud; (2) that the defendant participated in the scheme

6

by means of material false pretenses, representations or promises; and (3) that the defendant acted knowingly. See Goldsmith, 109 F.3d at 715; United States v. Falcone, 934 F.2d 1528, 1539-40 (11th Cir. 1991), modified in part, 960 F.2d 988 (11th Cir. 1992); United States v. Swearingen, 858 F.2d 1555, 1556 (11th Cir. 1988).

18 U.S.C. § 1001, entitled "Statements or Entries Generally," provides in relevant part:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> >
> > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> >
> > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title or imprisoned not more than 5 years, or both.
>
> ***

Id. Thus, in order to convict under § 1001, the government is required to prove (1) that the defendant made a false statement; (2) that the statement was material; (3)

that the defendant acted with specific intent to mislead; and (4) that the matter was within the purview of a federal government agency. See United States v. Puente, 982 F.2d 156, 158 (5th Cir. 1993).

The government's sole allegation of fraud in this case is that, at the time McCarrick signed the loan documents, he had no intention of buying the spray paint booth, as he represented. Specifically, Count One charged that McCarrick committed bank fraud by falsely promising, on his loan application, that he planned to buy a spray paint booth, in order to defraud the government of $12,679 . Count Two charged McCarrick with making a false statement to the SBA by acknowledging, on his "Settlement Statement," that he planned to use the loan proceeds in accordance with the terms of the loan authorization, even though he knew he was not going to buy the spray paint booth. Thus, McCarrick's convictions under both § 1344 and § 1001 depend on whether the jury could infer, from the evidence adduced at trial, that McCarrick did not intend to buy the spray paint booth at the time he signed the loan documents.

No evidence was presented of events occurring prior to McCarrick's signing of the loan documents that related to his alleged intent to defraud. The evidence at trial consisted entirely of events that occurred subsequent to the signing of the loan documents. The government concedes that any criminal intent McCarrick formed

8

after signing the loan documents cannot support his convictions on the crimes charged in the indictment, which require that McCarrick have acted with intent to defraud the SBA at the time of the signing of the loan documents. As the government notes, however, evidence of McCarrick's subsequent conduct may be considered if it supports a reasonable inference as to McCarrick's prior intent. Thus, the question in this case is whether the jury could properly infer from McCarrick's conduct subsequent to signing the loan documents–which was the only evidence in this case–that he intended to defraud the SBA at the time he signed the documents. We have carefully reviewed the record and must conclude that the evidence presented in this case does not support a rational inference of the requisite prior intent, beyond a reasonable doubt.

The government seeks to support its contention that McCarrick did not intend to buy the spray paint booth at the time he signed the loan documents with the following three factual circumstances: (1) McCarrick's business bounced approximately twenty checks during the month of December 1994, after the loan was authorized, but before the proceeds were disbursed at the closing; (2) McCarrick canceled his order for the spray paint booth "only" four weeks after McVittie ordered it from the manufacturer, even though McVittie told him it would probably take four-to-six weeks to deliver; and (3) McCarrick's girlfriend signed

McVittie's name on the $12,679 check earmarked for the spray paint booth, which McCarrick deposited into Fleet's business account.[8]  The government also argues alternatively, relying on United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995), that the jury's purported disbelief of McCarrick's testimony–by itself–entitled it to find McCarrick guilty beyond a reasonable doubt.

McCarrick responds that the evidence shows that everything on the documents he signed was truthful, that he intended to purchase the spray paint booth when he signed the loan documents, and that it was only later, after leasing the new facility and purchasing all the equipment he promised to purchase (with the exception of the spray paint booth) that his business difficulties began, causing him to cancel the order for the spray paint booth.  Any wrongdoing he may have committed, McCarrick contends, occurred subsequent to the signing of the loan documents, and is insufficient to support the jury's inference that he intended to defraud the SBA at the requisite time.  We agree.

First, the government argues that because twenty-two of McCarrick's business checks were returned with "Non-Sufficient Funds" ("NSF") in the month of December, he knew he could not afford to buy the spray paint booth, as listed on the loan application of November 9th.  The record shows that McCarrick wrote a

[8]McCarrick was not charged with forgery.

total of approximately ninety-five checks during this period, and the twenty-two NSF checks represented payments for ordinary operating expenses of between $30 and $500, with the majority between $100 and $300. The government has not offered any explanation as to why the NSF checks would have made McCarrick aware, when he signed the loan documents, that he could not afford the spray paint booth, as represented. First, the government has not introduced any evidence showing that McCarrick actually knew of all of the returned checks at the time of the December 23 closing. Nine of the twenty-two checks were returned on December 21 and 22, and the government has not shown that word of the non-sufficient funds reached McCarrick only one or two days later, which is unlikely. Moreover, there is no explanation of why the NSF checks worked an adverse change in Fleet's financial condition, or showed McCarrick that he could no longer afford the spray paint booth. The record is clear that the expenses represented by the NSF checks could easily be covered by the $14,000 check McCarrick was receiving for operating capital and there is no evidence in the record that Fleet's business or operations had changed, or that McCarrick failed to maintain–in good condition–any of the assets he listed on the loan application as collateral.

Likewise, the fact that McCarrick canceled the paint booth only four weeks after it was ordered, during the third week of January 1995, does not provide a

11

sufficient basis, on this record, for the inference that he did not intend to buy it in the first place. The sale proposal from McVittie, which McCarrick signed, indicates that McCarrick had contracted with McVittie to buy the spray paint booth, along with the other equipment, even prior to the loan authorization and closing.[9] Both McCarrick and McVittie testified that the booth was actually ordered. McCarrick testified that he canceled the order due to unforseen business losses resulting in part from his inability to fill standing customer paint orders without the paint booth,[10] and McVittie testified that the order had to be canceled because of difficulty in obtaining the necessary installation permits. The government offered no evidence to refute this testimony or to show that McCarrick intended, or had any reason, to cancel the order at the time he signed the loan documents.

Nor does the fact that McCarrick and his girlfriend may have improperly endorsed the $12,679 check for the spray paint booth and deposited it into Fleet's bank account, by itself, suffice to show that McCarrick did not intend, at the time of the signing of the loan documents, to use that money for its allotted purpose.

---

[9]See footnote 5, above.

[10]McCarrick also testified that his business losses resulted in part from the loss of retail business that occurred when Manatee County required him to take down signs identifying his business.

While this evidence could plausibly contribute to such an inference if it were combined with other evidence, there is no other probative evidence in this case, and it cannot do so standing alone. Even if we assume that, in depositing the check into Fleet's business account, McCarrick wrongfully intended to use the money for general business expenses until the spray paint booth arrived–and then to pay for the booth from the commingled funds when it did arrive–it simply does not follow that he did not intend to purchase the spray paint booth at the time he signed the loan documents.

Singly or taken together, the government's three pieces of circumstantial evidence do not provide a basis from which to infer beyond a reasonable doubt that McCarrick intended to defraud the SBA at the time he signed the loan documents. To find for the government, the factfinder would have to ignore all of the undisputed evidence in the case: that McCarrick leased a new garage, set up and decorated the garage, put up signs advertising his business, and spent $24,000 for a tire machine, two lifts, and a frame machine–in short all the equipment necessary to do auto body work. The factfinder would then have to conclude that, despite all of this preparatory effort and expense, McCarrick knew all along he was not going to buy the spray paint booth, the last piece of equipment necessary to complete body

13

repairs, and thereby intended to defraud the SBA of $12,679.[11] The evidence

overwhelmingly contradicts such a conclusion.

Finally, we reject the government's assertion that the jury's purported

disbelief of McCarrick's testimony can be used as the <u>sole</u> basis to support a

conviction beyond a reasonable doubt, even in the absence of any other probative

government evidence.  <u>Brown</u> does not stand for such a proposition.  In <u>Brown</u>, we

held that, <u>in combination</u> with other evidence, the jury's disbelief of a defendant's

testimony may be used to help establish his guilt.  We explained that "a statement

by a defendant, if disbelieved by the jury may be considered as <u>substantive evidence</u>

of the defendant's guilt . . . . [a]t least where some corroborative evidence exists for

the charged offense . . . ."  <u>Brown</u>, 53 F.3d at 314 (emphasis in original).[12]  Our

cases since <u>Brown</u> have reiterated the government's fundamental obligation to

---

[11] The testimony at trial was undisputed–with government witnesses, McVittie, and McGrath, and defendant McCarrick agreeing–that without a spray booth, purchasing a frame machine makes little business sense because repaired vehicles could not then be repainted at the same establishment.

[12] The defendant in <u>Brown</u> was convicted of money laundering.  The conviction required proof that the defendant knew that the laundered money was the proceeds of illegal activity, which, in <u>Brown</u>, consisted of drug activity.  The government presented the direct testimony of other witnesses, including a co-conspirator, that the defendant was part of the drug organization generating the laundered money.  The government's evidence also showed that the defendant made drug-related phone calls, drove from Georgia to Texas in furtherance of the drug conspiracy, and personally picked up a six-pound shipment of marijuana.  <u>See</u> <u>Brown</u>, 53 F.3d at 314.  In combination with this evidence, we held that the jury's disbelief of the defendant's testimony could be used to help establish his guilt.  <u>See</u> <u>id.</u>

14

establish guilt in its case-in-chief.  See United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir. 1999) (Brown supports conclusion that "the [defendant's incredible testimony], combined with the other evidence of his involvement in these conspiracies, convinces us that there was sufficient evidence to sustain his convictions.") (emphasis supplied); United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996); United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir. 1996).  In this case, however, the government has adduced no evidence from which the jury could draw a permissible inference that McCarrick intended to defraud the SBA at the time he signed the loan documents, and we therefore reverse his conviction.

Although a jury has wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence, this power is not without limits, and this Court cannot affirm a criminal conviction by an unlimited application of a jury's "power to infer" no matter how attenuated the link between the evidence and the defendant's guilt on a necessary element of the offense of conviction.  In view of the uncontradicted evidence of McCarrick's compliance with every provision of the loan agreement besides the purchase of the spray paint booth, and of Fleet's unforeseen and certainly-unintended business difficulties and financial decline, the link between the events that occurred after McCarrick signed the loan documents and McCarrick's alleged intent to defraud is too attenuated to support his

15

convictions for the crimes with which he was charged and convicted.

## CONCLUSION

For the foregoing reasons, McCarrick's convictions are,

**REVERSED.**