[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 1, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-15615
Non-Argument Calendar

_____

D. C. Docket No. 02-00056-CR-ORL-19-DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARNOLD DALE WIGGINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 1, 2005)**

Before TJOFLAT, DUBINA and FAY, Circuit Judges.

PER CURIAM:

Arnold Dale Wiggins appeals his conviction for using a cellular telephone to communicate a bomb threat in violation of 18 U.S.C. § 844(e). He argues that there was insufficient evidence to support the jury's conviction and that his motion for a judgment of acquittal should have been granted. For the reasons stated more fully below, we affirm the denial of his motion for a judgment of acquittal based on the sufficiency of the evidence.

The charging indictment alleged that Wiggins used his cell phone to communicate a bomb threat to his employer, the Precision Engineering and Construction Company ("PECC") on or about June 1, 2001. A jury found him guilty after a trial and Wiggins received a sentence of 18 months' imprisonment.

At trial, the government presented the testimony of Raeann Smith, a PECC secretary on the pertinent date of June 1, 2001, whose job included answering the telephone. She testified that the PECC work number was 813-754-7916, and that on June 1, 2001, while answering the telephone, she received a call from someone who said: "You'd better get your guys out of the Cape.[1] I have a bomb, and it's going to go off." Smith did not remember much about the voice, but told someone during an investigative interview that she thought the voice sounded "like a black guy." She also recalled that the voice sounded muffled, "like maybe someone had

_____

[1] "The Cape" is an apparent reference to Cape Canaveral in Florida.

their hand over the phone."  After receiving the call, Smith contacted "Brad," the owner of the company, and Brad picked up the phone for line 754-7916 and dialed star 69 (*69) to retrieve the number of the last phone call made to that phone.  On cross-examination of Smith, the defendant, Wiggins, was asked to read the statement allegedly made to Smith on June 1, and after the statement had been read, Smith was unable to say for a fact that Wiggins's voice matched the voice of the caller who had phoned in the bomb threat.

Next, the government called Brad Hite, one of PECC's owners, who testified that Smith  is his secretary.  Hite testified that in June 2001, PECC was doing construction at Space Launch Complex 37 at Cape Canaveral Air Force Station ("the Cape") and using roughly 100-200 men employed from local union halls.  All of the workers selected were employees of PECC.  According to PECC records, Wiggins was employed by PECC in 2001.  Hite testified that, on June 1, 2001, PECC received a phone call and the caller indicated that there was a bomb at PECC's job site at the Cape.  Smith received the call, relayed the information to Hite, and Hite dialed star 69 (*69) to find the caller's number.  Hite wrote the number down and called "Mr. Farrell," who was the superintendent in charge of the job site at the Cape.  On cross-examination, Hite stated that he never received any reports or complaints regarding Wiggins or his work, nor did Hite have any

communication with Wiggins. Hite admitted that, nearly seven months after the bomb threat, Wiggins was suitable and eligible to be rehired.

The government also called Richard Farrell, who was the project manager at PECC's Cape Canaveral project on June 1, 2001. Farrell estimated that maybe 50-100 persons were working for PECC that day, and testified that he received a call from Hite on June 1, 2001, informing Farrell that there had been a phone call indicating that a bomb was on-site. In response, Farrell contacted his client, and he believed it was his secretary who placed a call to security. Farrell testified that he seemed to remember Hite telling him that he had star 69'd the caller and provided Farrell with the number, which he passed on to Washington Group (the client). Farrell could not recall seeing Wiggins until the day of the bomb threat, and further testified that he had recently become aware that Wiggins was rehired by PECC several months after the bomb threat occurred. Farrell could also not recall having received any sort of communications from Wiggins or any occasion on which Wiggins had been reported as being disgruntled or upset at the company. Finally, Farrell testified that the decision to hire Wiggins was part of a general request to the union and, therefore, the company had no control over who the union would send.

The next witness was Judith Parish (formerly Judith Jinks), who worked as a

security dispatcher at the Kennedy Space Center receiving, <u>inter alia</u>, all 911 and emergency calls made at Space Launch Complex 37 at the Cape. Parish testified that, on June 1, 2001, she received a 911 call from Complex 37 indicating that a bomb threat had been called in.  Parish was given the phone number of the phone that had been used to call in the bomb threat, which she dialed, testifying that "it sounded like somebody picked it up and hung up."  Parish called a second time, and this time Wiggins answered and, when asked whether he had placed a bomb threat, responded that he had not.  Parish asked Wiggins to meet a captain "down at the gate."  She stated that the number she called was 352-416-3530.  On cross-examination, Parish indicated that, after Wiggins answered the phone, he remained on the phone and was cooperative at all times, but she could not recall whether or not she had given a statement indicating that Wiggins sounded shocked to have been suspected of making the call.

Gary Hogeland, a criminal investigator at the Kennedy Space Center, also testified regarding the events of June 1, 2001.  That day, Hogeland was called to respond to a bomb threat at Complex 37 and, upon arrival on the scene, was informed that someone on the complex had called in the threat from a cell phone.  Eventually, the cell phone was brought to Hogeland, who delivered it to Air Force Office of Special Investigation ("OSI") agents without dialing any numbers,

5

tampering with it, or turning it on in any way. Hogeland admitted that he could neither identify the person who brought him the phone or the person to whom he delivered the phone.

After Hogeland had testified, the government called Wilfredo Torres-Negron, a special agent with the OSI, whose job it is to investigate crimes at Air Force facilities. His testimony established that the cell phone was delivered to OSI agent Biel, and that the cell phone remained within the OSI's chain of custody. The phone was taken out of the evidence locker one time for photos to be taken of it, and then remained locked up, in unchanged condition, until it was brought to trial. Torres-Negron testified that he could not say whether the phone remained in the evidence room during each change of custodian. The phone further left the evidence room on one other occasion, and was removed by another evidence custodian for additional photos to be taken, at which point the phone was turned on to "look for the numbers."

The government then called Nextel Communications strategic care specialist Cathy Casias, who handles billing issues for Nextel cell phone customers across the United States. She testified that, after a customer places a cell phone call, that call is automatically recorded by computer and logged into the customer's account within two hours. Casias accessed Wiggins's account at the government's

6

direction, and Wiggins's account showed that, on June 1, 2001, at 10:34 a.m., a call was placed from phone number 352-516-4530 to phone number 813-754-7916 (PECC) in Plant City, Florida. On cross-examination, Casias admitted that customers occasionally complain about calls showing up on their bills that they didn't make. However, with respect to Wiggins's account, she testified that the only way the computer could have made a mistake was if the cell phone number itself had been cloned, and that Nextel's security makes it difficult, although not impossible, to clone a number.

Also testifying was Michael Little, who works in Nextel's Information Technology department for records and billing. Little explained that, when a Nextel caller places a call, all of the information is relayed to a "switch" where information is logged as a record that Little's "area" retrieves by logging into the switch and then sending the information to a billing system that electronically invoices the call record. Little further explained that Nextel operates on a digital, as opposed to analog system, the importance being that in an analog system, it was possible to "pick" a cell phone's serial number and subscriber number from airwaves generated by an analog system, enabling someone to "clone" or "replicate" another subscriber within the same switch used to generate the original call, thereby permitting the person to make phone calls billed to a bona fide

7

subscriber. Since he had begun working with Nextel, Little could not recall ever encountering a "true clone." However, Little also testified that Nextel's billing system would "error out" an attempted "clone" call due to mismatches in certain subscriber-related information. Finally, Little testified that Nextel's phones record a date and time stamp sent from a tower to the phone every time a number was dialed from that phone, and if a call were made from a particular phone at 10:34 a.m. on June 1, 2001, that number would immediately become stamped in the phone's memory and remain unchanged.

On cross-examination, Little stated that the computer used to generate electronic billing records was not perfect and occasionally made mistakes. He also testified that a cell phone's memory is capable of storing at least the ten most recently dialed numbers and that, after about ten calls had been made, the subsequently dialed numbers would replace those in the memory, thus "purging" the older numbers from the phone.

Next, OSI Agent Douglas Biel testified that he was assigned to the Cape on June 1, 2001, received a call that day to respond to a bomb threat that had been called into the Cape and, upon arrival, learned that the bomb threat was false. As part of the investigation, Biel received a cell phone from Gary Hogeland and recorded the information on Air Force form 52, and based on that form, testified

8

that the phone had been located at Patrick Air Force Base since June 1, 2001. Biel testified that he had personally taken the phone apart for the purpose of taking photographs of the phone and its components, and those photographs were admitted at trial.

While investigating, Biel and another agent interviewed Wiggins, who indicated that he had been at work the morning of June 1 and made a few a phone calls to his wife and his union hall. After returning from break between 9:00 a.m. and 9:30 a.m., Wiggins stated that he had the phone in his possession the entire time with a 10-15 second lapse to avoid an obstacle, at which time Wiggins took the phone off of his work belt but had it in his eyesight the entire time. At no point did Wiggins indicate that he had given his phone to a coworker. Wiggins consented to the government's search of his phone records.

On cross-examination, Biel testified that, on June 1, 2001, Wiggins was not employed by PECC, but rather by a different company, Precision Mechanical, which did not receive a bomb threat. Biel admitted that, when he testified before the grand jury, he made a mistake and gave the jury incorrect information regarding Wiggins's employer as of June 1, 2001. Biel also testified that nothing in his investigation revealed Wiggins's motive for calling in a bomb threat. He further admitted that (1) he was not present when photographs of Wiggins's phone

9

and the phone's screen depiction were taken; (2) he was aware that Adrianna Vorderbruggen was the photographer; and (3) the reason why her name was never listed on Air Force form 52 was because, pursuant to OSI policy, the only person who could sign the phone out of custody was the evidence custodian, who at that time was Torres-Negron. It was further shown that, at the time Biel testified before the grand jury, he had indicated that there were no numbers stored in Wiggins's cell phone caller identification. However, Biel testified that his testimony before the grand jury was inaccurate and a mistake, as the cell phone's call history had numbers stored in it. Biel also testified that Wiggins's employer was not important to the investigation and that all of the workers at the Pad that day were evacuated and did not return to work.

The government rested its case and Wiggins moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. Wiggins presented his own summary of the government's evidence and proceeded to argue that it was "not sufficient to send this case to a jury so that they can guess and speculate as to the possibilities out there." Wiggins described those possibilities as follows: (1) Wiggins did it; (2) someone else working with him did it; (3) the computer malfunctioned; and (4) someone tampered with the phone and programmed the number in it after the fact. Based on the foregoing, Wiggins argued:

10

> Jurors aren't asked to guess and to speculate. . . . [T]his evidence is not enough pointed at this defendant to go back to that jury. . . . [T]hey would have to guess, to speculate. They couldn't come back and find this defendant guilty on that evidence. They could find easily that that phone was used, but they can't find he used it. . . . It's not their job to go back and connect the dots and guess and speculate. . . . I say to this court that [the] evidence is not here in this case today.

The district court reserved ruling on the motion pending presentation to the jury. Wiggins then took the stand to testify on his own behalf. In June 2001, Wiggins worked as a pipefitter for a local union hall installing piping systems, valves, and clean flow systems. The union hall itself offered jobs to Wiggins depending on the demands of local contractors and, as a result, Wiggins often did not know in advance how long a particular job would last. Wiggins admitted that he had been convicted of a felony. In March and April of 2001, Wiggins was sent to work for PECC, and he reported no problems with his work, calling PECC a "great company." The job ended on April 10, 2001, at which point Wiggins obtained another job, and eventually, Wiggins was hired by PECC again in December 2001.

On June 1, 2001, Wiggins worked for Precision Mechanical at Launchpad 37 at the Cape. That morning, between 10:00 and 10:30 a.m., he was working inside a small metal tower, standing on a ladder, and removing 50-60 pound iron valves. Wiggins's task was to hook the pipe valves on a rope and then lower them

11

down to the ground a few feet at a time, avoiding the other pipes, conduits, hangars, and mechanical systems. At one point, Wiggins climbed around a valve and his "phone got hung up on the rope from the valve, so [he] took the phone off, tossed it down to [his] partner's foot and asked him to sit it down." Wiggins testified that he then dropped his phone down from three stories to "Foots," another pipefitter, who caught the phone and held on to the phone for maybe 10 to 15 seconds. Soon after, Wiggins's boss told him that everyone was being evacuated and, as he and the other crewmembers were leaving, Wiggins received a phone call and lost the signal.

After he regained a signal, Wiggins received another phone call from a person he identified as Ms. Jinks (Parish) from Cape Canaveral security, asking Wiggins if he had placed a bomb threat with that phone. Wiggins denied that he had and then complied with Jinks's instructions, describing his clothing and agreeing to meet a security officer as requested. He testified that he was interviewed and did his best to cooperate with the government's investigation and told agents about "Foots." As to the government's theory of motive, i.e., that Wiggins wanted to start a long weekend early, Wiggins testified that he was scheduled to work Friday, Saturday, Sunday, and Monday, and that he preferred working on weekends because the pay was higher. Wiggins did not recall ever

seeing Foots again and, while he was willing to state that it was possible that someone else placed the bomb threat after he had relinquished control of his phone, Wiggins was unwilling to do so because he did not know for certain whether that, in fact, was what happened.

On cross examination, the government questioned Wiggins regarding the written statement he gave to investigators knowing that there had been a bomb threat called in to the Cape and that investigators believed the call originated from Wiggins's phone. In that statement, Wiggins stated that, when his phone got caught on the rope, he sat the phone down for a "split second," and no mention was made of "Foots." Wiggins admitted that there was a difference between a split second and 10-15 seconds and he agreed that the investigators should have been aware that Foots had Wiggins's phone in his possession if, in fact, it were true. Wiggins further admitted that, after a full day had transpired, he again failed to inform investigators that "Foots" had possession of Wiggins's phone, stating that it must have slipped his mind.

Next, the government presented Wiggins with his old cell phone and, after it had been turned on, Wiggins admitted that the call history revealed that, on June 1, 2001, one of the calls was received at 11:08 a.m. and that the number was 321-867-7627, the number of the security dispatcher, Jinks (Parish). Wiggins did not

13

dispute receiving that call. The phone also revealed that a phone call had been made at 10:34 a.m. to 813-754-7916, and Wiggins admitted that the phone call had been made to that number, which belonged to PECC. Finally, Wiggins admitted that he had twice been convicted in state court for writing worthless checks. On redirect, Wiggins reiterated that he had not phoned in a bomb threat and had no idea how the bomb threat got called in. Wiggins rested his case and reserved his Rule 29 motion for judgment of acquittal.

After closing arguments, the district court instructed the jury regarding the government's burden of proof beyond a reasonable doubt, the equal weight to be given to direct and circumstantial evidence, and the credibility of witnesses. The jurors were instructed that, in order to convict Wiggins, the government had to prove that he (1) made or caused to be made a threat to kill, injure, or intimidate any individual or to unlawfully damage or destroy a building by means of fire or an explosive; (2) used or caused to be used an instrument of commerce, such as a telephone, to communicate the threat; and (3) did so knowingly and willingly. The jury convicted Wiggins.

The court then gave Wiggins a chance to argue his Rule 29 motion for judgment of acquittal, and he adopted his original argument and further argued that he worked for a different company than PECC at the time of the bomb threat. He

14

also argued that he had taken the stand and denied making the call, a statement that was essentially unrefuted by any direct evidence. Wiggins stated that none of the circumstantial evidence proved that he dialed the number on the phone and, therefore, the government had not proven that he was the caller, requiring that he be acquitted. The court denied the motion and found that Wiggins's testimony at trial was different from the statement he made to investigators right after the bomb threat had been made, giving the jury the right to choose whether to believe Wiggins's testimony. Because the inconsistencies gave the jury a reasonable basis for disbelieving Wiggins, the court found that the jury had a reasonable basis for entering the verdict that it did. Wiggins was sentenced to 18 months' imprisonment.

On appeal, Wiggins argues that the district court erred by denying his motion for a judgment of acquittal because the evidence failed to show that Wiggins made a bomb threat. He argues that the jury's verdict was predicated on unreasonable inferences and speculation based on circumstantial evidence, meaning that the government did not satisfy the Due Process Clause's requirement that a defendant's guilt be proven beyond a reasonable doubt. Wiggins argues that the government was unable to show that Wiggins actually made the call or was on the phone at the time of the bomb threat on June 1, 2001, and that the testimony

15

indicating that Wiggins, who is white, sounded "like a black guy" and was "shocked" undercut any inference to the contrary. Finally, Wiggins argues that the government cannot rely on the fact that Wiggins testified in order to support his conviction on appeal because the issue is whether the government established its case in chief. If it were otherwise, Wiggins argues that he would, in essence, be forced to give up his right to testify in order to preserve his sufficiency of the evidence argument on appeal, which impermissibly would force defendants to surrender one constitutional right for another.

We review a challenge to the sufficiency of evidence de novo. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005). A guilty verdict will not be disturbed unless, "given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." Id. (quotation omitted). When evaluating the sufficiency of the evidence, we examine "the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor." Id. Furthermore, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the

16

evidence." United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997).

Finally, we are "bound by the jury's credibility determinations, and by its rejection

of the inferences raised by the defendant." United States v. Peters, 403 F.3d 1263,

1268 (11th Cir. 2005).

In order to convict Wiggins under 18 U.S.C. § 844(e), the government was

required to prove that Wiggins (1) used a telephone or other instrument affecting

interstate commerce; (2) made a threat concerning an attempt to kill, injure, or

intimidate any individual or to unlawfully damage or destroy any building by

means of fire or an explosive; and (3) did so willfully. See 18 U.S.C. § 844(e).

The evidence in this case, taken in a light most favorable to the government,

supports a reasonable inference of guilt. Testimony at trial established that a call

was placed to PECC from a phone whose number was traced to Wiggins's cell

phone and account with Nextel. The account records showed that a call was placed

from Wiggins's phone, number 352-516-4530, to PECC, number 813-754-7916, at

10:34 a.m. on June 1, 2001. The phone's "call history" also indicated that the call

was made. The caller stated that there was a bomb located at "the Cape," or Cape

Canaveral. During an interview with OSI agents, Wiggins stated that he had the

phone in his possession or within eyeshot the entire morning. Finally, there was

testimony indicating the improbability that the phone call was generated from

17

either a "cloned" number or was a "computer error" in light of the fact that the phone itself had date stamped the phone call, date, and time.

Wiggins argues that the jury could not have found him guilty beyond a reasonable doubt based on this evidence because it lends nearly equal support to a theory of guilt and a theory of innocence, citing Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982). This argument is misplaced. The evidence viewed in a light most favorable to the government demonstrates only that the government did not have a direct witness to Wiggins placing the phone call. This is not surprising given the brevity of the phone call and the location from which the phone call was made. Wiggins makes much of the fact that a witness testified that the caller sounded "like a black guy" and that when asked about whether he had called in a bomb threat, a witness said he "sounded shocked." But that evidence does not change the fact that Wiggins's cell phone and cell phone account records demonstrated that, on June 1, 2001, a phone call was made from his phone to PECC, a phone call was made from security to his cell phone shortly thereafter, and the cell phone was in his possession or eyeshot throughout the morning.

Furthermore, Wiggins chose to testify on his own behalf, testifying that, at some point that morning, just prior to being evacuated from the premises, he dropped his phone 35 feet through pipes, conduits, hangars, and mechanical

18

systems to "Foots," who had the phone for at least 10-15 seconds before Wiggins retrieved it. As we have held, "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." United State v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). "[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." Id. Here, it was the jury's province to gauge Wiggins's credibility, and it was free to disbelieve his testimony. See Peters, 403 F.3d at 1270 ("[i]t is the jury's prerogative to disbelieve a defendants testimony. . . ." (quotation and citation omitted). Given that Wiggins's testimony conflicted with the statements he gave OSI agents and Wiggins had two prior felony convictions for writing worthless checks (crimes of dishonesty), it was not unreasonable for the jury to disbelieve Wiggins's testimony or, for that matter, his theory of innocence.

Wiggins seeks to circumvent Brown by arguing that there was no corroborative evidence to support an inference that Wiggins made the phone call. See, e.g., United States v. McCarrick, 294 F.3d 1286, 1293 (11th Cir. 2002) (holding that, under Brown, there must be some corroborative evidence in addition to the defendant's testimony to affirm a jury's guilty verdict). This argument is without merit. The government's case, as noted above, proved that the call was

19

made from Wiggins's phone and, prior to Wiggins taking the stand, Agent Biel testified that Wiggins had stated that the phone was in his possession or eyeshot at all times during the morning of June 1, 2001. No mention was made of "Foots" or the fact that someone other than Wiggins might have had possession of the phone for a sufficient length of time to make the phone call. While there was no direct witness to the phone call, the circumstantial evidence, taken in a light favorable to the government, supported an inference that Wiggins, and not someone else, made the phone call. This inference is a reasonable one, especially in light of testimony establishing that it was highly improbable that the call was a computer error or made from a "cloned" number. As noted above, the evidence need not exclude every possible hypothesis of innocence. Thus, there was corroborating evidence supporting a reasonable inference of guilt.

Wiggins's final argument is that the rule in Brown creates "an intolerable situation wherein a criminal defendant is forced to give up his right to testify in order to preserve a sufficiency of the evidence argument on appeal." However, as we noted in Brown, "a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." Brown, 53 F.3d at 314. "A defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the

risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty." Id. (quotation and citation omitted). Wiggins could have decided not to testify, but having chosen to do so, he ran the risk that the jury might disbelieve his story. We conclude that Wiggins's testimony, combined with corroborative evidence viewed in a light most favorable to the government, supported a reasonable inference of guilt. We, therefore, affirm Wiggins's conviction.

**AFFIRMED.**