[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 24-10633

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KRISTEN ARIEALE WILLIAMS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:23-cr-00129-KD-B-1

————————————————

Before LAGOA, BRASHER, and WILSON, Circuit Judges.

PER CURIAM:

Kristen Williams appeals her convictions for conspiracy to commit bank fraud, bank fraud, aggravated identity theft, and theft and possession of a postal service key. She argues that the district court erred in denying her motions for judgment of acquittal because the government's evidence was insufficient for a reasonable jury to convict her. For the reasons below, however, we affirm.

**I.**

Williams worked for the United States Postal Service as a mail carrier at the Prichard Post Office. As a mail carrier, she had access to arrow keys that can unlock blue collection boxes and apartment mailboxes. Because arrow keys offer easy access to mail, fraudsters will sometimes pay postal employees to obtain these keys.

A man named Sean White purchased an arrow key from Williams for $2,500 in cash. As White testified at trial, he wanted the arrow key because he could use it to easily "get a large amount of checks[.]" White testified that he would steal checks from mailboxes and use those checks to create counterfeit ones. To make money via the counterfeit checks, White would invite people to let the fraudulent checks be deposited in their bank accounts. These people—known as "heads"—would then receive a cut from the fraudulent deposit. Williams became a head. She let White deposit

counterfeit checks into her account, and met with him at a Walmart and a PNC bank so that he could give her counterfeit checks to deposit. Sometimes, Williams even stole checks from the mail herself, and gave them to an intermediary who would then give them to White to create counterfeits.

In October 2022, Inspector Michael Maxey received complaints of mail theft—specifically, that individuals were driving to blue collection boxes at various locations and using a key to open those boxes and remove mail. To stop that theft, Inspector Maxey organized a surveillance arrest operation in November 2022. As part of that operation, law enforcement apprehended White after a high-speed car chase—White had used an arrow key to open three collection boxes, stolen mail, and dumped the mail into the back of his car. White was arrested, pleaded guilty, and agreed to cooperate in further investigation.

That investigation led to Williams. In March 2023, working with Inspector Maxey, White texted Williams that he had to "throw that last piece"—"piece" referring to the arrow key that Williams had sold White—and "need[ed] another one," for which he would pay $4,000. Williams replied that she "went through so much anxiety the last time" but would "think on it," warning that Prichard Post Office was "very strict about it now."

Inspector Maxey then interviewed Williams at the post office. Clips of the interview were played for the jury. In those clips, Williams stated that she knew White "do like check fraud" and that she "was letting him put checks in my account." She said that she

and White had "met at Walmart" so that White could give her a counterfeit check to deposit. And she explained that she and White would each receive a cut.

Inspector Maxey also obtained Williams's PNC bank records, which revealed two deposits relevant for this appeal. First, those records revealed that on June 14, 2022, a counterfeit check of $9,975.21 was deposited into Williams's PNC account and drawn on Wilshire Royale Hotel in Burbank, California. Postal scanner records located Williams that day at a PNC bank, a deviation from her route, and Williams testified that she had signed the back of a check she knew was made out for $9,975. A hotel manager at Wilshire Royale Hotel, in turn, testified that he did not know Williams, that there was no reason for his business to send her $9,975.21, and that although the check displayed his signature as the authorized signature, he had not signed the check.

Second, Williams's bank records revealed that on June 21, 2022, a $4,000 check was deposited into her account and drawn on Akbar Talebi, a business owner in Theodore, Alabama. The check from Talebi was stolen out of the mail and fraudulently deposited into Williams's account using Talebi's real name, real business address, his signature, and his Bank of America account information. Talebi testified at trial that he did not know Williams and she had no connection to his business.

A grand jury charged Williams in a superseding indictment with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (count 1); two counts of bank fraud, in violation

of 18 U.S.C. § 1344(1) (counts 2 and 3); one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (count 4); and one count of theft and possession of a postal service key, in violation of 18 U.S.C. § 1704 (count 5). After the government rested, Williams moved for a judgment of acquittal on all counts. The court denied that motion, and later denied Williams's renewed motion for judgment of acquittal after she rested her case. The jury then found Williams guilty on all counts of the superseding indictment, and this appeal followed. On appeal, Williams challenges the sufficiency of the evidence underlying her convictions.

## II.

We review *de novo* a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). We will uphold the district court's denial of a motion for judgment of acquittal if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. *United States v. Holmes*, 814 F.3d 1246, 1250 (11th Cir. 2016). We view the evidence in the light most favorable to the government and draw all reasonable inferences in favor of the jury's verdict. *United States v. Clay*, 832 F.3d 1259, 1293 (11th Cir. 2016). We will not overturn a jury's verdict if a reasonable construction of the evidence would allow a jury to find the defendant guilty beyond a reasonable doubt. *Id*. at 1294.

## III.

Williams challenges the sufficiency of the evidence underlying her convictions for conspiracy to commit bank fraud, bank fraud, aggravated identity theft, and theft and possession of a postal service key. Each of these challenges fails.

### A.

We start with conspiracy to commit bank fraud (count 1). *See* 18 U.S.C. §§ 1344(1), 1349. To establish conspiracy under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (internal marks omitted). A conviction for bank fraud under 18 U.S.C. § 1344(1), in turn, requires proof that (1) the defendant "intentionally participated in a scheme or artifice to defraud another of money or property;" and (2) the intended victim was a federally insured financial institution. *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002).

A jury could find beyond a reasonable doubt that Williams conspired to commit bank fraud. The jury heard clips of Williams's interview with Inspector Maxey, in which she disclosed that she knew White "do like check fraud," that she "was letting him put checks into [her] account," and that she received a cut from the scheme. Through White's testimony, the jury heard that Williams met with White to deposit counterfeit checks into her bank

account, and that sometimes she stole checks from the mail and gave them to an intermediary who then gave them to White to create counterfeits. A jury could conclude from this evidence that Williams knowingly joined White's scheme to defraud banks of money through the deposit of counterfeit checks. *See Vernon*, 723 F.3d at 1273; *McCarrick*, 294 F.3d at 1290. Williams argues that the government did not prove that she "knew of [the] existence of a bank fraud scheme," but a jury could easily conclude otherwise after hearing her tell Inspector Maxey on recording that she knew White engaged in check fraud, and after hearing evidence that she stole checks and met with White to deposit counterfeit checks into her account.

## B.

We turn to Williams's convictions on two counts of bank fraud (counts 2 and 3)—one count arising from the check deposited into her account on June 14, 2022, the other count from the check deposited on June 21, 2022. Again, a bank fraud conviction requires proof that the defendant intentionally participated in a scheme or artifice to defraud a federally insured financial institution of money or property. *McCarrick*, 294 F.3d at 1290. *See* 18 U.S.C. § 1344(1).

A jury could reasonably conclude that Williams committed bank fraud in relation to the June 14 and June 21 checks. Again, the jury heard evidence that Williams knew of White's check fraud scheme, let him deposit counterfeit checks into her account, and stole checks from the mail for White to create counterfeits. Bank records revealed, more specifically, that a counterfeit check of

$9,975.21 purporting to be from Wilshire Royale Hotel was deposited into Williams's PNC account on June 14, 2022; Williams testified that she signed a check she knew was made out for that amount, and postal scanner records located her that day at a PNC bank, a deviation from her route. Similarly, bank records revealed that a $4,000 check purporting to be from Talebi was deposited into Williams's account on June 21, 2022, and the jury heard testimony that the check was stolen out of the mail and that Talebi had no business connection to Williams. Based on all this evidence, a rational juror could readily conclude that Williams intentionally worked with White to get counterfeit checks drawn on Wilshire Royale Hotel and Talebi on June 14 and 21, 2022—and thus, that she intentionally participated in a scheme to defraud banks of money that did not belong to her. *See McCarrick*, 294 F.3d at 1290; 18 U.S.C. § 1344(1). The evidence underlying her bank fraud convictions was sufficient.

## C.

We turn to Williams's conviction for aggravated identity theft (count 4). To prove aggravated identity theft under 18 U.S.C. § 1028A(a)(1), the government must prove "that the defendant: (1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in [section] 1028A(c)." *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) (internal marks omitted). Bank fraud is a felony enumerated in section 1028A(c). *See* 18 U.S.C. § 1028A(c)(5). A means of identification

includes a person's name and information such as a "unique electronic identification number, address, or routing code[.]" 18 U.S.C. §§ 1028(d)(7)(A), 1028(d)(7)(C).

There was enough evidence for a jury to reasonably conclude that Williams committed aggravated identity theft. Based on the evidence above, a jury could infer that Williams knowingly signed and deposited a counterfeit check of $9,975.21 purporting to be from Wilshire Royale Hotel. Likewise, a jury could infer from the evidence above that Williams worked with White to deposit a counterfeit version of a check from Talebi—a counterfeit containing Talebi's real name, real business address, signature, and bank account information—into her bank account. Thus, a jury could easily conclude that Williams used Wilshire Royale Hotel's and Talebi's names and account numbers to deceptively convey to banks that those payors had authorized legitimate checks to Williams as the payee. In other words, there was enough evidence that Williams knowingly used others' means of identification to commit bank fraud. *See Barrington*, 648 F.3d at 1192.

Williams argues that the government failed to prove that she "used" another's means of identification, because to "use" means to impersonate another, and Williams did not pretend that she *was* Wilshire Royale Hotel or Talebi. But our caselaw does not confine "use" to such a narrow meaning. For instance, in *United States v. Gladden*, a billing manager altered a prescription form already signed by a physician, to convey to insurance companies that the physician authorized certain prescriptions when the physician,

in fact, had not. *See* 78 F.4th 1232, 1245–46 (11th Cir. 2023). Although the billing manager never tried to convey that she was the physician, she still "used" the physician's means of identification because she "appropriated [the physician's] personal information to deceive others." *Id.* at 1246. So too here. Williams may not have impersonated Wilshire Royale Hotel or Talebi, but she used their means of identification to deceptively convey that they had authorized payments to her when, in fact, they had not. The evidence underlying Williams's aggravated identity theft conviction was sufficient.

### D.

Lastly, sufficient evidence supported Williams's conviction for theft and possession of a postal service key. *See* 18 U.S.C. § 1704. A defendant is guilty of such an offense if she knowingly and unlawfully possessed a key suited to a lock adopted by the Post Office Department or the Postal Service with the intent to unlawfully or improperly use, sell, or otherwise dispose of the key. *See* 18 U.S.C. § 1704. The jury heard White testify that he purchased an arrow key from Williams for $2,500 in cash. And it heard a text message conversation, read into evidence, where White asked Williams for "another" arrow key, and Williams replied that she "went through so much anxiety the last time" and that the post office was now "very strict"—further indicating that she had stolen and sold an arrow key to Williams before. A reasonable jury could find that Williams knowingly and unlawfully possessed an arrow key with the intent to unlawfully sell it to White. *See* 18 U.S.C. § 1704.

24-10633    Opinion of the Court    11

## IV.

We **AFFIRM** the district court.