[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 16, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-15395

_____

D.C. Docket No. 03-00037-CR-3-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

BRENDA J. WILLIAMS,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Florida

_____

**(November 16, 2004)**

Before EDMONDSON, Chief Judge, FAY, Circuit Judge, and CORRIGAN*,
District Judge.

FAY, Circuit Judge:

_____

*Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida,
sitting by designation.

A jury returned a verdict of guilty against the Defendant, Brenda J. Williams, on one count of bank fraud or aiding and abetting bank fraud.[1] The Government maintains that the Defendant made false representations to bank officials in an attempt to have them extend credit to her daughter. Citing insufficiency of the evidence, the trial judge granted the Defendant's motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Government now appeals the district court's judgment. The Government contends that the district court improperly viewed the evidence in the light most favorable to the Defendant and incorrectly credited those portions of her testimony that conflicted with the Government's evidence. After careful consideration, we hold that the district court erred in entering the judgment of acquittal and reverse and remand.

## Background

The Defendant was charged, in Count Eleven of an eleven count indictment, with bank fraud in violation of 18 U.S.C. § 1344(2), or aiding and abetting bank fraud in violation of 18 U.S.C. § 2. The Defendant's daughter, Tammy Williams Neely ("Neely"), the primary defendant named in the Indictment, pled guilty to four of the eleven counts charged against her, including Count Eleven. The Defendant, charged

---

[1] Count Eleven of the Indictment charges bank fraud or, in the alternative, aiding and abetting bank fraud. The jury verdict makes no distinction in finding the Defendant "Guilty" of Count Eleven.

2

with only one count, proceeded to trial. Count Eleven charged that the Defendant knowingly and willfully executed "a scheme and artifice to obtain monies, funds and credits owned by and under the custody and control of the Monsanto Employees Credit Union ("MECU"), a federally insured financial institution, by means of materially false and fraudulent pretenses, representations and promises." At the close of the Government's case, the Defendant moved for a judgment of acquittal, which the trial judge denied. The Defendant then testified and renewed her motion for judgment of acquittal. Reserving ruling on the motion, the trial judge allowed the case to go to the jury, and the jury returned a verdict of guilty. After the verdict and prior to the scheduled sentencing hearing, the district court issued its order granting the judgment of acquittal, citing insufficient evidence to justify a conviction.

## **Facts**[2]

The Defendant and her husband, Jimmy Williams, held a joint savings account at MECU. Their daughter, Neely, had a savings as well as an outstanding loan account at MECU. According to Wenda Downing ("Downing"), a supervisor at the Milton Branch of MECU, in May 2002, Neely requested a letter setting out the status

---

[2]As explained below, where a jury returns a verdict of guilty and the district court sets aside that verdict by entering a judgment of acquittal based on the insufficiency of the evidence, the decision of the district court is entitled to no deference. United States v. Greer, 850 F.2d 1447, 1450 (11th Cir. 1988). Therefore, the facts set forth herein are presented in a light most favorable to the Government, regardless of whether the evidence is direct or circumstantial. United States v. Burns, 597 F.2d 939, 941 (5th Cir. 1979).

of her loan. Downing provided Neely with the letter, which stated that she had received a $5,000 loan in September 1999 and that Jimmy Williams paid down the loan to $2,016.38.

On September 11, 2002, Downing received a telephone call from Chris Rutledge ("Rutledge"), the CEO of MECU, who asked her about a letter that referred to "Dr. Tammy Williams Neely." The letter stated that Neely held a six-month certificate of deposit ("CD") under the Defendant's account number valued in excess of $6.7 million, despite the fact that the Defendant's CD was only worth $2,050. The letter was on MECU letterhead, contained Downing's signature, and was dated May 21, 2002, the date Downing had provided Neely with the letter regarding the status of her $5,000 loan. Downing denied writing such a letter.

Apparently, Neely had several outstanding short term loans at First National Bank of Crestview, totaling $138,000. The loans were overdue, and in order to show First National that she had money at MECU, Neely altered Downing's earlier letter and presented it to First National. Neely explained to First National that the money had come from the sale of a signed World Series baseball[3] that had belonged to her

_____

[3]There were, in fact, two baseballs in Neely's possession: a 1962 World Series baseball signed by the New York Yankees and a 1972 World Series baseball signed by the Detroit Tigers. Neely valued the 1962 baseball at $6 million and the 1972 baseball at $2 million. Though not material to our analysis, there is some inconsistency throughout the record evidence due to the alternating references to one baseball versus two baseballs. Other than what can be inferred by the references to $8 million, it is unclear whether Neely was purporting to have sold only one or

grandfather. First National then contacted Rutledge at MECU to verify the letter.

The day after Downing learned of the altered letter, the Defendant called her to inquire about a money wire that she expected to transfer into her account. The Defendant told Downing that she was expecting $8 million from the sale of an antique in eight days. The Defendant also sought to: (1) add her daughter, Neely, to her account; (2) remove her husband from the account because he would spend the money she was expecting; and (3) make Neely the beneficiary on her CD.

The Defendant visited MECU the following day, September 13, 2002, and, according to testimony, appeared nervous and excited. The Defendant explained to Downing that the antique was a baseball that had been in her family for some time, and that a person who "had more money than brains," was purchasing the ball. The Defendant also told Downing that she and Neely intended to invest the money in real estate ventures.

On September 17, 2002, the Defendant and her husband added Neely as a beneficiary to their savings account, and on October 15, 2002, the Defendant and Neely attempted to open a joint checking account at the Milton Branch MECU, but were refused. Later that same day, the Defendant and her husband opened a checking account at MECU's main branch in Pensacola with Neely and Jaime Nelson

_____

both baseballs.

(their other daughter) as beneficiaries. The Defendant never informed anyone at MECU's main branch that she had not been permitted to open an account earlier that day. The Defendant was provided with starter checks for the account. The Defendant knew that account beneficiaries at MECU were not permitted to write checks on the account.

Neely then went to First National on October 16, 2002, and wrote a $6 million check from the Defendant's MECU starter checks to open a money market account. Neely directed $5.67 million of the $6 million into the money market and the remainder into the checking account she held with the Defendant. On October 17, 2002, First National received a telephone call from an FBI agent advising that Neely's $6 million check was no good. When notified by First National that there were insufficient funds to clear the check, Neely and the Defendant stated that they would go to MECU to fix the problem. They subsequently informed First National that the situation had been resolved at MECU – that they were simply awaiting a money wire into the account.

Neely and the Defendant then requested a meeting with Rutledge, the CEO of MECU, regarding their account. So, on October 18, 2002, a meeting was held between Rutledge, Neely, the Defendant, and Special Agent Steve Harker of the FBI. The meeting was taped by the FBI, and during the meeting, Agent Harker posed as

6

an outside auditor for the bank.

The transcript of the meeting showed that, at the outset of the meeting, the Defendant asked whether the $8 million wire had arrived. She then told Rutledge and Agent Harker that the baseball "was something that we've been keeping as a heirloom for a long time, and it's not gonna do us any good after we're dead." (October 18, 2002 Transcript, Gov't Exh. 10B at 5). The Defendant explained that she intended to transfer some of the expected wire to First National, but that she would leave some of the money in her account with MECU. The Defendant also requested a cashier's check to take to First National, and when it appeared that no progress was being made at the meeting, the Defendant and Neely expressed that they would makes efforts to retrieve additional information about the wire transfer, i.e., bill of sale, name of attorney handling the transaction.

At the conclusion of the Government's case, the Defendant moved for judgment of acquittal, arguing that she did not have any criminal intent because she believed her daughter when she told her that she had sold the baseballs. The district court, however, denied the motion, finding a question of fact as to the Defendant's fraudulent intent.

The basis of the Defendant's defense was that she was, in fact, a victim of her daughter's fraud and lies. Significant to this Court's analysis, the Defendant elected

7

to take the stand in her own defense. The Defendant testified that she believed Neely when she told her how much the baseballs were worth, and various other deceptions, including that Neely had cancer, was a medical doctor, and had earned a Ph.D. The Defendant contended that the account she opened at MECU's main branch in Pensacola had nothing to do with her attempt to open a joint account with Neely, and that after the Defendant's meeting with Rutledge, the Defendant called First National at the direction of Neely to advise that the funds would be available soon. In addition, the Defendant admitted that she knew Neely had taken some of the starter checks from the new account but that she was unaware of the amount of the check until just prior to her meeting with Rutledge.

The Defendant also admitted that she lied to bank officials about the ownership of the baseballs, and that she knew that they belonged to Neely's husband. She also stated that she had done research via the Internet to determine the year of the balls based on their signatures, but failed to question her daughter's valuation of the baseballs at $8 million.

After the defense rested, the Defendant renewed her motion for judgment of acquittal. The district court responded:

> I believe what Ms. Williams testified to from the stand. Now, it's not what I believed, but what the jury believes in this case, so I think that controls. There is certainly evidence that the jury could find either way.

But I will keep it under advisement, and let the jury resolve the question of what they believe and what they don't believe.

(Gov't Exhibit 10B at 114). Therefore, as permitted by Federal Rule of Criminal Procedure 29(b), the court deferred ruling on the motion, reserving its decision pending return of the jury's sentence. The jury then returned a guilty verdict, but the court withheld adjudication of guilt until sentencing.

Just before sentencing, the court issued its order granting the Defendant's motion for judgment of acquittal, finding insufficient evidence to support a conviction of bank fraud. In the court's opinion, the Government's proof did not establish the Defendant's guilt beyond a reasonable doubt. The Government appeals this judgment.

## Discussion

Where a jury returns a verdict of guilty and the district court sets aside that verdict by entering a judgment of acquittal based on the insufficiency of the evidence, the decision of the district court "is entitled to no deference." United States v. Greer, 850 F.2d 1447, 1450 (11th Cir. 1988) (citing United States v. Hayes Int'l Corp., 786 F.2d 1499, 1500 (11th Cir. 1986)). Therefore, we must decide "whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." Id.

9

(citing United States v. Varkonyi, 611 F.2d 84, 85-86 (5th Cir. 1980)).  All credibility choices must be made in support of the jury's verdict.  Id. (citing United States v. Gianni, 678 F.2d 956, 958-59 (11th Cir. 1982); United States v. Burns, 597 F.2d 939, 941 (5th Cir. 1979)).

A jury is free to choose among reasonable constructions of the evidence. United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983).  Thus, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990).

On appeal, the Government argues that the district court erred in granting a post-verdict motion for judgment of acquittal, contending that it improperly viewed the evidence in the light most favorable to the Defendant and incorrectly credited the portions of her testimony that conflicted with the Government's evidence.  We agree.

Pursuant to Federal Rule of Criminal Procedure 29, a district court may set aside a guilty verdict and enter judgment of acquittal if there is insufficient evidence to sustain the verdict.  In order to convict a defendant of bank fraud pursuant to 18 U.S.C. § 1344(2), the Government must prove beyond a reasonable doubt, that: (1) a scheme existed to obtain money, funds, or credit in the custody of a federally

insured financial institution; (2) the defendant participated in the scheme by means of false pretenses, representations, or promises, which were material; and (3) the defendant acted knowingly. United States v. Dennis, 237 F.3d 1295, 1303 (11th Cir. 2001). Likewise, to be convicted of aiding and abetting bank fraud, the Government must demonstrate that the Defendant had the same willfulness and unlawful intent as the actual perpetrators of the fraud, that is, she acted with the intent to defraud. United States v. Perez, 922 F.2d 782, 785 (11th Cir. 1991).[4]

Although the district court believed the Defendant's testimony and did not believe that she ever requested any action from the MECU until the alleged wire transfer arrived, the court was required to resolve any conflicts in the evidence in favor of the Government and accept all reasonable inferences that tend to support the Government's case. See United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999). This test applies regardless of whether the evidence is direct or circumstantial. United States v. Macko, F.2d 1526, 1528 (11th Cir. 1993); Burns, 597 F.2d at 941.

We find that there was sufficient evidence to satisfy the first two elements of 18 U.S.C. § 1344 – that a scheme existed to obtain money, funds, or credit in the custody of a federally insured financial institution and that the Defendant participated

---

[4]While the Government must show intent, it need not show Defendant's knowledge of the particular means the principals employed to carry out the criminal activity. Id.

11

in the scheme by means of false pretenses, representations, or promises, which were material. The evidence showed that the Defendant was savvy enough to use the Internet to research the baseballs. The jury could have reasonably concluded that the Defendant researched the 1962 Yankees baseball team to verify the team roster and the signatures that would appear on such a baseball in order to make the story about the ball's value more convincing. Also, the evidence showed that the Defendant continued to assert the impending arrival of the wire transfer despite the fact that the alleged sale of the baseballs still had not occurred a month after telling Downing that she expected an $8 million transfer in eight days. In addition, the Defendant admitted that she lied for Neely regarding the ownership of the baseballs, despite the fact that she knew they belonged to her daughter's estranged husband. Moreover, the taped meeting with Rutledge and Agent Harker revealed the Defendant requesting a $6 million cashier's check. The jury could have reasonably inferred that the Defendant requested that MECU provide her with the cashier's check at that time, before the wire transfer arrived to MECU. Such an inference is further supported by Rutledge's testimony that he actually believed that the Defendant wanted MECU to issue the $6 million cashier's check at that taped meeting. The evidence showed that the Defendant was willing to lie repeatedly for her daughter's benefit as well as her own gain (e.g., misrepresentations to bank officials regarding the true ownership of the

12

alleged $8 million baseballs).

The district court was troubled by the absence of "some material misrepresentation *by the defendant* to attempt to obtain money or credit *in addition* to the deposit of bad checks." (Court's Order, Docket Entry 53 at 5-6). The court found that the Defendant's misrepresentations "were, at best, only tangentially related to the $6 million check."[5] Id. at 6. With regard to the Defendant's intent to defraud, the district court found no evidence showing the Defendant's knowledge of the $6 million check until just prior to the taped meeting. The problem with such a "finding" is that the district court based it upon the testimony of the Defendant, overlooking conflicting evidence presented by the Government. The jury was free to disbelieve the testimony of the Defendant in favor of the testimony presented by the Government.

The evidence was certainly sufficient to prove that the Defendant knew that there was no sale of the baseballs, that there was no wire transfer, and that she was

---

[5]The district court relied on Williams v. United States, 458 U.S. 279 (1982) for the proposition that merely writing or depositing a bad check, or even taking part in a check kiting scheme does not amount to bank fraud. Although we have concluded that merely passing a fraudulent check cannot constitute bank fraud, this Court has specifically found that making additional false representations in order to convince a federally-insured bank to extend credit can violate 18 U.S.C. § 1344. United States v. Swearingen, 858 F.2d 1555, 1557 (11th Cir. 1988). Also, it is not necessary for the Government to demonstrate that the Defendant personally benefitted from the artifice in order for a conviction to be sustained. United States v. Williams, 728 F.2d 1402 (11th Cir. 1984).

aiding and abetting her daughter's bank fraud. This Court has previously held that circumstantial evidence may prove knowledge and intent. See generally Macko, 994 F.2d at 1533. Such is the case here.

In addition to the aforementioned evidence of guilt, the Defendant elected to take the stand and to testify in her own defense. "Defendants in criminal trials are not obliged to testify. And a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988). "Most important, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). "By 'substantive' we mean evidence adduced for the purpose of proving a fact in issue as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony." Id. This Circuit has said that "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." Id. (citations omitted).

The Defendant testified under oath that she had no independent knowledge of the value of the baseballs, of the wire transfer, or of the $6 million check – that she relied on what she told by her daughter. She also testified that she was not trying to get the bank to issue a $6 million cashier's check, and essentially extend credit to her

14

and her daughter, before the arrival of a wire transfer. However, the jury, hearing her words and seeing her demeanor, was entitled to disbelieve the Defendant's testimony and, in fact, to believe the opposite of what she said. See Brown, 53 F.3d at 314.

Where some corroborative evidence of guilt exists for the charged offense (as is true in this case) and the defendant takes the stand in her own defense, the Defendant's testimony, denying guilt, may establish, by itself, elements of the offense. Id. at 315. "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." Id.

Consequently, we find that there was sufficient evidence to support the jury's guilty verdict on bank fraud. Thus, we reverse and remand for the district court to reinstate the jury's verdict and sentence the Defendant, Brenda J. Williams, accordingly.

**REVERSED AND REMANDED.**

CORRIGAN, District Judge, concurring:

I concur in the Court's holding that, giving the government's evidence every benefit of the doubt, there was sufficient evidence to support the jury's verdict. I also agree that the jury was free to disbelieve the defendant's denial of criminal intent. See United States v. Brown, 53 F.3d 312 (11th Cir. 1995). However, I regard the Court's discussion of Brown concerning the use of the defendant's denial of guilt as substantive evidence of guilt as *dicta* and potentially problematic.

In United States v. McCarrick, 294 F.3d 1286 (11th Cir. 2002), decided seven years after Brown, the Court, in holding that there was insufficient evidence to support the jury's verdict notwithstanding that the defendant testified and denied guilt, explained: "Our cases since Brown have reiterated the government's fundamental obligation to establish its case-in-chief." See id. at 1293 (citing United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir. 1999); United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996); United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir. 1996)).

In my view, it remains unclear in the Eleventh Circuit when negative inferences from a defendant's denial of guilt can be used by an appellate court to remedy an otherwise deficient government case. Both Brown and McCarrick indicate that such negative inferences can become positive evidence of guilt, but only where there is

16

"some corroborative evidence of guilt." How much corroborative evidence is necessary, short of evidence establishing guilt beyond a reasonable doubt? Neither Brown nor McCarrick answer that question. Other courts have recognized this problem and have held that an appellate court may not affirm "on the supposition that the defendant's demeanor filled the gap in the government's proof" lest appellate review concerning the sufficiency of the evidence become meaningless in cases where the defendant testifies and denies guilt. See United States v. Zeigler, 994 F.2d 845, 845-46 (D.C. Cir. 1993); see also, United States v. Sliker, 751 F.2d 477 (2d Cir. 1984); but see United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991)(holding that a defendant's denial of guilt can become evidence of guilt to add to the other evidence). McCarrick, with its emphasis on the government's fundamental obligation to prove its case, seems to accord more with this view. However, because it is unnecessary to the result in this case to face this question, I would not do so.