[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 4, 2006
THOMAS K. KAHN
CLERK

No. 05-13288

D.C. Docket No. 03-20139 CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

MORAN SHEPKARU,
a.k.a. Lorain S.
a.k.a. Moran S.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 4, 2006)**

Before ANDERSON, FAY and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

The United States appeals the district court's post-jury verdict of acquittal of Moran Shepkaru (a.k.a. Loraine S. or Moran S.) and the district court's alternative granting of a motion for a new trial. The government contends that the district court erred in finding insufficient evidence to support the jury's verdict of guilty to conspiracy to commit wire fraud. Because there was sufficient circumstantial evidence of a conspiracy to commit wire fraud, we REVERSE and VACATE the post-verdict judgment of acquittal. However, we AFFIRM the district court's order granting a new trial.

## FACTS

In 2003, Shepkaru and ten other defendants were indicted for: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343; (2) wire fraud, in violation of 18 U.S.C. §§ 1842 and 3; (3) extortion, in violation of 18 U.S.C. §§ 1951 and 2; (4) making a false bill of lading, in violation of 49 U.S.C. § 80116 and 18 U.S.C. § 2; and (5) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

The indictment charged all defendants with having been members of a conspiracy that represented to the public that they were reputable, long-established moving companies that provided low-cost estimates to customers in order to induce the consumers to hire the company to move their furnishings. Shepkaru's indictment

2

alleged that she communicated moving estimates to customers via telephone, facsimile, and e-mail.

The indictment further alleged that several co-conspirators supervised loading foremen who would rush the customer through the company's paperwork, often causing the unsuspecting customer to sign blank or incomplete bills of lading and other documents that did not inform the customer of the total price for their move. Once the customer's furnishings were loaded onto the moving truck, the foremen would fraudulently inflate the price of the move by claiming that the customer had many more cubic feet of cargo than initially estimated or by overcharging the customer for material used for packing.

When a customer would contact the moving company regarding delivery of their furnishings, the company would refuse to deliver the customer's furnishings until the customer paid the inflated price for the move. United States Department of Transportation regulations require that all of a customer's furnishings must be returned upon payment of 110 percent of the original price quote. See 49 C.F.R. § 375.405(b)(1)-(10). Nevertheless, co-conspirators ignored complaints about the fraudulently inflated prices and lied to customers about the delivery of their furnishings, sometimes using false names when speaking with customers over the phone or in writing.

3

On October 14, 2004, Shepkaru was convicted of conspiring to commit wire fraud, but acquitted of the remaining substantive counts, which included wire fraud. The district court subsequently granted her motion for acquittal and motion for a new trial.

## ANALYSIS

### I. Acquittal

We review de novo a district court's grant of acquittal under Federal Rule of Criminal Procedure 29(c) and give no deference to the district court's decision.[2] United States v. Williams, 390 F.3d 1319, 1323 (11th Cir. 2004). We must determine whether the evidence at trial was sufficient to permit a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. See United States v. Allen, 302 F.3d 1260, 1262 (11th Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We view the evidence in the light most favorable to the government, accepting the jury's reasonable inferences and credibility determinations. Glasser v. United States, 315 U.S. 60, 80 (1942), superseded by rule on other grounds, Bourjaily v. United States, 483 U.S. 171 (1987).

---

[2]The United States's appeal of a judgment of acquittal may be reviewed on appeal. United States v. Shelley, 405 F.3d 1195, 1200 (11th Cir. 2005).

To prove conspiracy under 18 U.S.C. § 371, the government must establish the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of the conspiracy. United States v. Suba, 132 F.3d 662, 672 (11th Cir. 1998). To prove conspiracy to commit wire fraud, the government must further show a defendant's intent to devise any scheme to defraud another of money or property and use of the wire for purposes of executing the scheme. 18 U.S.C. § 1343; Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991). The scheme need not be carried out but if the scheme had been executed, it would deceive a reasonably prudent person. Id. at 1498-99.

The existence of an agreement may be proven by circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005). The government may establish knowledge of an illegal agreement by showing that the defendant "knew the essential object of the conspiracy." Id. Moreover, in reviewing the prosecution's case, we draw no distinction between circumstantial and direct evidence. United States v. Navarro-Ordas, 770 F.2d 959, 966 (11th Cir. 1985). "It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion

5

except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999) (citations omitted).

The government asserts that the district court committed several factual and legal errors that included overlooking probative evidence of Shepkaru's knowing participation in the scheme. Shepkaru responds that there was no evidence of an express agreement between her and anyone else. She acknowledges that circumstantial evidence may establish the existence of a conspiratorial agreement but only where the inferences are reasonable. She asserts that there is no evidence suggesting conspiratorial meetings, proof that she received the three percent of the total move price, or records reflecting the employee payment schedules and amounts.

The evidence established that Shepkaru worked at the moving company with constantly changing names for over two years and that she earned commissions from the amount collected from some moves. At a minimum, Shepkaru would have been aware that customers' bills had been increased and that some fraudulent scheme was afoot.

Indeed, the government may establish knowledge of an illegal agreement by showing that the defendant knew the essential object of the conspiracy. Shepkaru originated the low bids. The victims' testimony established that Shepkaru negotiated

the original offers without receiving assistance from others. Matthew Nassbaum testified that his original quote from Shepkaru was escalated from $2,900 to $8,400. He also testified that he realized he had been duped on his original move and called the moving company, posing as a new customer. He stated he spoke to Shepkaru who provided the same quote and reiterated that he would not be charged for additional cubic footage unless an extra truck was required. Ben Gersh also testified that his initial quote from Shepkaru at $750 was increased to $5,300.

Although coconspirator Toledano's testimony did not unequivocally state that Shepkaru agreed to participate in wire fraud, some of his testimony was sufficient to permit a reasonable jury to conclude that Shepkaru knew of and participated in the scheme. He testified that Shepkaru was working with the moving company before he arrived and continued to work as the company constantly changed names due to its bad reputation. He stated that even though other employees, including himself, quit working for the company due to their disgust with its business practices, Shepkaru continued working. He stated that Shepkaru was compensated by a weekly salary plus a three percent commission of the total the customer paid as evidenced by multiple job reports. He specifically testified that the moving company changed its name because of its bad reputation, customer complaints, and fraud. He stated that Shepkaru knew of and was paid by commissions of the total amount collected from

7

the moves because each salesperson maintained a list of the original estimates and the amount collected.

The government presented several documents in Shepkaru's handwriting showing a substantial difference between the original estimate and the amount collected, and that 99 percent of the customers were overcharged for moves. Toledano testified that several of the moving estimate original bids were in Shepkaru's handwriting and that he spoke with Shepkaru about "how much the customer actually paid for the move." In addition, Toledano testified that the moving company owner, van drivers, he, and Shepkaru met in the office to discuss making more money. A jury could reasonably infer that such meetings concerned the fraudulent business practices given the nature of the business.

Shepkaru argues that she only provided the quotes and did not increase the prices, thus absolving her from the conspiracy to defraud. For instance, as part of the FBI's undercover move, Shepkaru competitively negotiated a lower price after the agent claimed that a rival mover offered a lower price. The responsive email was signed by Loran S., which was Shepkaru's alias. Contrary to the district court's conclusion, there is evidence to permit a jury to reasonably find that Shepkaru originated the low ball bids.

The evidence presented at trial shows that Shepkaru's offers to consumers were inconsistent and involved misstatements. On multiple occasions, the prices were almost double the initial quote. For instance, Onsgard/Lenz quoted "all inclusive" $850 and charged $1940 for a handling fee; an $880 moving fee based on cubic footage was increased because it was calculated on weight contrary to the terms of Shepkaru's price quote; an all-inclusive $750 offer increased to $5,300 due to additional labor and insurance charges, which later were discovered to be false; and Nassbaum's $2,900 all-inclusive offer was increased to $8,400 by pick up costs despite Shepkaru's assurances that the initial quote was the complete cost unless an additional van was required. Moreover, Toledano testified that he and Shepkaru discussed the amount that the customer paid for the move and that customers were being lied to. He also said that Shepkaru was the only one who stayed with the company. Based upon these statements, the jury could reasonably infer that she was placing a low ball bid to lure customers into a transaction. From Toledano's testimony that Shepkaru received a commission for the amount charged each customer, the jury could impute knowledge of the fraud.

A jury could reasonably infer by the follow-up calls that Shepkaru had agreed to participate in the conspiracy. Evidence established that Shepkaru received calls placed by disgruntled customers – sometimes the same customers she extended an

9

offer to – that she often ignored. She did not inform the customers that their possessions could be redeemed on payment of 110 percent of the initial estimate, although she was personally notified of this requirement by FBI Agent William Schurek. A jury could reasonably believe from Shepkaru's conduct that she knowingly participated in a conspiracy to defraud those customers. The elements of conspiracy do not require a showing that Shepkaru received her three percent commission even though Toledano testified that she received commissions from fraudulent moves.

The district court was legally incorrect in finding that direct evidence of a conspiratorial agreement is required. See Silvestri, 409 F.3d at 1328; Williams, 390 F.3d at 1324. Moreover, the district court incorrectly ignored the jury findings against Shepkaru's version of events and dismissed all reasonable circumstantial evidence. Williams, 390 F.3d at 1324 (reversing acquittal where the district court did not apply the correct standard requiring resolution of facts "in favor of the government" and acceptance of all reasonable inferences in support of the government's case); see also United States v. Miranda, 425 F.3d 953, 961-62 (11th Cir. 2005) (reversing post-trial judgment of acquittal).

In conclusion, the government showed that Shepkaru was engaged in a systematic scheme to provide low offers to induce customers of the moving company

10

to use their services by use of the electronic mail and telephone. Though the government's more specific theories failed for lack of evidence, the record was sufficient to allow a reasonable finder of fact to conclude that Shepkaru conspired to engage in a fraudulent scheme to defraud customers of both money and property by using the wires.

## II. New Trial

A search warrant executed at Shepkaru's work place yielded a substantial number of records, including bills. The documents were disclosed in pretrial discovery and introduced into evidence at trial. The government created a chart from the seized records showing each individual moving contract initial quote, the ultimate bill, 110 percent of the original bid, and a percentage and actual difference between 110 percent of the initial quote and the final bill.

The grant of a new trial is reviewed for abuse of discretion but the abuse of discretion standard employed in this situation is more exacting. See United States v. Hernandez, 433 F.3d 1328, 1335-36 (11th Cir. 2005). A district court may weigh the evidence and assess the credibility of witnesses, but it may not set aside the verdict unless allowing the verdict to stand would result in a miscarriage of justice. Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004).

The district court found that the summary chart and the commission sheets were vital to the government's proof that Shepkaru was aware of and benefitted from the fraud occurring at the place of employment. As such, the district court's ruling that Shepkaru's substantial rights were "affected to such a degree by the government's introduction of the summary chart and underlying business records" and grant of a new trial were not an abuse of discretion.

The government downplays the chart as only having the potential for misuse even though its information is accurate. The government does not address the fact that accurate information can be used to create inaccurate inferences, which was the case here. Providing a jury with a chart that lists 144 "victims," without showing that each listed person was actually a victim, is sufficient to support the district court's finding of prejudice for a new trial. Moreover, the insinuation that Shepkaru received a commission from the total amount billed for each of the 144 so-called "victims" – even though it was not the amount actually collected in each case – may likewise be prejudicial.

Therefore, the judgment of acquittal is REVERSED and VACATED, and the district court's granting of a new trial is AFFIRMED.