[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-17167
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 14, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00023-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERALD WAYNE MCCOY,
JAMES BRIAN GLENN,

Defendants-Appellants,

JAMES PATRICK GLENN,

Defendant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(December 14, 2009)

Before CARNES, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Gerald McCoy and Brian Glenn appeal their convictions for conspiracy to defraud the United States and conspiracy to commit money laundering. 18 U.S.C. §§ 371, 1956(a)(1)(B)(i), 1956(h). McCoy and Glenn challenge the sufficiency of the evidence to support their convictions. McCoy also challenges the denial of his motion for a new trial and, for the first time on appeal, the failure of the district court to instruct the jury about wire fraud. We affirm.

## I. BACKGROUND

McCoy; his friend, James (Jim) Patrick Glenn; and Jim Glenn's son, Brian Glenn, colluded to exploit the non-bid process used by the United States to award contracts to socially and economically disadvantaged businesses, known as 8(a) companies, for personal financial gain. The evidence established that Jim Glenn used his position at the United States Space and Naval Warfare Systems Center in Pensacola, Florida, to award lucrative government contracts to Matrix Engineering, which was controlled by McCoy and subcontracted its work to Finbar Technologies, Inc., a business founded by McCoy and Jim Glenn. Brian Glenn, who controlled Finbar, received proceeds from those contracts and distributed them to his father, McCoy, and to associates.

2

We divide in two parts our discussion of the background. First, we discuss the relationship between McCoy and the Glenns, how they defrauded the government and laundered money through Finbar, and the discovery of their crimes. Second, we discuss the trial of McCoy and Brian Glenn.

*A. The Relationships and Crimes of Jim Glenn, McCoy, and Brian Glenn*

Jim Glenn was a supervisor at the Warfare Systems Center and administered contracts for computer systems for the Department of Defense and other government agencies. Because the Center was not funded by government appropriations, the Center sold its management services to businesses. Jim Glenn marketed the services of the Center and served as a liason between the organizations and contractors who created and implemented computer systems. Jim Glenn created project plans and communicated with and approved payments for contractors.

McCoy developed a friendship with Jim Glenn while working for organizations that provided information technology services for the government. In 2002, Jim Glenn supervised a contract between the Center and McCoy's employer, Information Support Systems, Inc. McCoy encouraged Information Systems to pursue more government contracts and convinced the company to open an office in Pensacola to be near the Center.

3

While McCoy worked for Information Systems, he cultivated a relationship with the owners of Matrix Engineering in San Marcos, California. McCoy persuaded the owners of Matrix to obtain status as an 8(a) company and create a new division that would offer information technology services. On May 22, 2002, Jim Glenn emailed the owner of Matrix and expressed interest in awarding Matrix a five-year contract worth 20 million dollars for information technology services. Jim copied McCoy, a vice president of Information Systems, on the email. The owners of Matrix later met Jim and his girlfriend, Donna Lohr, during a party at McCoy's house.

In October 2002, Jim Glenn met with attorneys in the Baldwin County District Attorney's office to market technological updates that the Center allegedly could provide for a project called the Southwest Alabama Integrated Criminal Justice System. The System project involved a computer program that allowed local, state, and federal law enforcement agencies to access simultaneously and share information about parolees, probationers, and prisoners. The System project was funded with a ten million dollar grant from the Department of Defense. Jim Glenn represented that the Center would connect the System to Homeland Security computer systems. That same month, Jim Glenn and McCoy incorporated a company named Finbar Technologies, Inc. Both Jim Glenn and McCoy were

4

listed as the directors of Finbar.

In late 2002, officers at Information Systems learned they would not receive government contracts as previously intimated by McCoy, and McCoy was forced to resign. McCoy was hired by Matrix in March 2003 and was given control over the information technology division with the understanding that he could obtain government contracts with the Center. McCoy also assumed control of the billing and accounts payable at Matrix. McCoy later negotiated for Information Systems to lease its office in Pensacola to Matrix.

Meanwhile, Jim Glenn's son, Brian Glenn, decided to resign from the United States Air Force and open his own information technology business. Brian Glenn assumed control of Finbar. In April 2003, Brian opened a bank account for Finbar on which he was the sole signatory. In May 2003, Brian became a director of Finbar and, in June 2003, was discharged from the Air Force.

In September 2003, McCoy and Jim Glenn executed several contracts for Matrix to provide information technology services for the Center on behalf of the System project. Although a clause in the contracts prohibited Matrix from subcontracting "the performance of any of these requirements without prior written approval of the Small Business Administration and the contracting officer," Matrix subcontracted work to Finbar. Jim Glenn did not disclose his relationship with

Finbar to the Department of Defense.

In December 2003, McCoy submitted a bid for work that Matrix estimated would cost $99,960.66, and Jim Glenn approved the contract. When an employee of the Center, Sharon Reynolds, located an invoice that showed the work cost $31,000, she requested backup documents to explain the difference. After Jim guaranteed he would provide the documents, Reynolds paid Matrix. During a later review of the work, Reynolds noticed that Jim had not provided backup documents. Matrix later submitted an invoice from Finbar.

Finbar submitted some invoices directly to Jim Glenn, which he approved. Sharon Reynolds found an invoice dated November 2003 that charged the Center $23,520 for the creation, development, and testing of a global positioning system tracking unit. Krista Long, a Matrix employee who handled billing at McCoy's direction, did not recall that Matrix had billed the Center for the work.

Finbar also invoiced and received payment through Matrix for work on the System project. Finbar invoiced Matrix $19,444.80 for an "initial setup and installation" and researching "parolee tracking end-user devices providers." Finbar also submitted other invoices to Matrix charging the System project thousands and tens of thousands of dollars for developing and installing software, testing a tracking program, and working on a mapping service. Jim Glenn approved

6

payment of those bills from Matrix from the grant allocated to the System project.

After the owner of Matrix discovered that McCoy had diverted money from another division of Matrix to pay expenses of the information technologies division, the owner fired McCoy. A few days later, Jim Glenn called the owner of Matrix and instructed her to pay Finbar. Jim told the owner that Finbar needed the money to make payroll and suggested that, if the invoices were not paid, Matrix could lose its status as an 8(a) business.

The owner of Matrix discovered that McCoy had overcharged the government for office space. After the Center awarded Matrix work on the Systems project, McCoy convinced the administrator of the project to sublease the office space in Pensacola that Matrix had rented from Information Systems. The invoices for that office space revealed that Matrix had overcharged the government between $10,000 and $12,000 a month.

The owner of Matrix also discovered that Matrix had violated its contract with the Systems project by subcontracting work to Finbar. The owner learned that Brian Glenn owned Finbar and that McCoy and Jim Glenn served as directors. The owner of Matrix emailed Brian Glenn to tell him that Matrix would no longer associate with Finbar.

In the meantime, McCoy plotted to buy Matrix surreptitiously and sought

7

financing from an investment banker, Brian Schwartz. Schwartz presented a business proposal to the owners of Matrix and reviewed its accounts related to the System project. Schwartz learned that Finbar was operating out of the office Matrix had subleased to the System project and five employees in that office had been billed interchangeably as employees of Finbar and Matrix. Schwartz also discovered that Matrix had overcharged the System project for the office space.

McCoy told Schwartz that Matrix received government contracts because of its relationship with Finbar. McCoy told Schwartz that Matrix would pay Finbar hundreds of thousands of dollars a month because Finbar could guarantee that Matrix would receive government contracts. McCoy explained that Finbar had a contact, Jim Glenn, who would ensure that Matrix received the contracts. Schwartz questioned McCoy about Jim Glenn's conflict of interest as a partner in Finbar. McCoy explained that Brian Glenn was the "figurehead for the head of Finbar." Schwartz investigated Brian Glenn and believed that he had overbilled the System project. When Schwartz expressed his concerns about the relationship between McCoy, the Glenns, and their companies, McCoy told Schwartz he "didn't understand how it worked." Schwartz refused to provide McCoy with financing to purchase Matrix.

In 2004, Assistant District Attorney Judy Newcomb reviewed the grant for

8

the System project and discovered that the Center had received $988,800 of the grant without providing a usable product to the project. In a meeting in June 2004, Jim Glenn was unable to explain what appeared to be excessive billing for work performed by Matrix and Finbar. Newcomb complained that the System project had been charged $25,000 for an eight- to ten-page draft of a document that compared software programs. When Newcomb stated that the document looked like something printed from the internet, Jim Glenn stated the Center had put its highest paid person on the project. Jim Glenn was unable to explain why the System project had paid between $80,000 and $90,000 for an architectural software program that was inaccessible and was comprised of standard software available from the government. Jim Glenn also was unable to explain why the System project was charged for a business analysis when the project had only three employees and the project never received the review. Jim Glenn confirmed that Matrix subcontracted its work to Finbar. The next month, July 2004, Jim Glenn retired from the Center.

Samuel Rucker of the Alabama Bureau of Investigation also discovered that the Center could not reconcile its supposed work with the amounts charged to the System project. Rucker determined that Finbar had failed to deliver a global positioning system to track parolees or an architectural program. Rucker also

9

discovered that Finbar had failed to deliver a workable inventory database and that Jim and Brian Glenn had charged an excessive amount to move computer equipment that could have been moved by state prisoners.

In March 2005, Newcomb reported her findings to the Department of Justice and complained about six payments to the Center: (1) $53,617.83 for Jim Glenn's salary; (2) $32,834.69 for the development of software to track parolees, which was never delivered; (3) $154,004.52 for architectural software that did not function and was distributed at no charge "at various seminars"; (4) $26,296 for a program comparison that could have been completed in one day by someone familiar with the internet; (5) $34,726.52 for a business review, which was never received; and (6) $28,803 for a project "identifying towers and mapping addresses" that was never delivered.

The internal affairs division of the Center began an investigation after receiving some invoices from Finbar because of Jim Glenn's interest in Finbar. The investigation revealed that Jim Glenn and McCoy had transferred ownership of Finbar to Brian Glenn shortly before the Center began its work on the System project. The investigation revealed that Jim Glenn had supervised his girlfriend, Donna Lohr, at the Center and that Lohr's daughter, Nicole Lohr, worked for Matrix on the System project. The federal government also discovered that Jim

Glenn had approved payment of bills submitted by Matrix that lacked backup documentation.

Krista Long provided other information to federal investigators about the relationship between Matrix, Finbar, and their owners. Long recalled that, as an employee of Matrix, she had received an email from Jim and Brian Glenn asking Long to help Finbar obtain security clearance to secure government contracts. Long remembered that in October 2003 McCoy directed her to create on behalf of Matrix an invoice that listed an hourly charge for a Finbar systems engineer. After McCoy was fired, Long contacted Jim Glenn to reconcile billing discrepancies. In May 2004, Long asked Jim how Matrix should bill $24,814.63 for work by a specialist. Jim instructed Long to submit an invoice to Center for $30,068. Long told investigators that Matrix paid Finbar from payments received from the Center. When Long later was hired by Finbar, Jim and Brian Glenn were present at the meeting, as well as Donna Lohr.

Norma Asbury, another Matrix employee, told investigators about accounting practices between Matrix and Finbar. Asbury explained that she received an invoice in September 2003 charging $19,444.80 for work on the System project. The invoice was sent from Brian Glenn's email address, Jbglenn@Finbartechnologies.com. Asbury recalled that, on another occasion,

11

McCoy hand delivered an invoice from Finbar for the development of a global positioning tracking unit. Asbury identified a check signed by McCoy from Matrix to Finbar paying that invoice. Asbury also identified other checks and a wire transfer paying invoices Finbar submitted to Matrix for the System project.

A review of the bank accounts of Matrix and Finbar showed how McCoy and the Glenns shared the profits from the System project. An auditor, Keith Melville, traced payments from Matrix to the Finbar bank account. In October 2003, Finbar received a payment by wire from Matrix of $19,444.80. In December 2003, McCoy signed a check from Matrix paying Finbar $6,401.60. Between 2003 and 2004, Matrix paid Finbar $88,822.12. Between May 2003 and July 2004, Jim Glenn deposited $24,700 into the Finbar account, and after July 2004, he deposited $19,500 into the Finbar account. Jim also processed a cashier's check for $8,000 and the back of the check had been endorsed with a stamp stating Finbar Technologies. Records of the Finbar bank account established that Brian Glenn wrote checks payable to his father, Nichole Lohr, the daughter of his father's girlfriend and an employee of Matrix, and McCoy. A few days after Brian Glenn received the October 2003 wire payment from Matrix, he paid his father $3700. Brian paid McCoy $615 and, in October 2004, Brian paid Nichole Lohr for a "pay period." Between October 2003 and January 2004, Brian paid his father a total of

12

$12,800. Brian wrote on the memo line of one of those checks that it was a "reimbursement." Between August 2004 and June 2006, Finbar paid Jim Glenn, McCoy, and Nichole Lohr a total of $36,928.75. A $4000 check written in November 2004 from an employee of Finbar to Jim Glenn stated the payment was for the "Jim Glenn loan."

Melville's investigation revealed that Brian Glenn was submitting excessive invoices to Matrix, and Matrix was, in turn, overcharging the Center. Between September 2003 and August 2004, Finbar submitted $165,518.07 in invoices to Matrix. Finbar charged Matrix $49,091.79 for furniture and other items, although Finbar had paid only $9000 for the furniture. In August 2003, Matrix charged the Center $47,549.58 for an invoice submitted by Finbar. Between April 2003 and July 2004, Matrix billed the Center more than 1.4 million dollars of which $383,929.50 could be traced to Finbar invoices.

In February 2008, a grand jury indicted McCoy, Jim Glenn, and Brian Glenn in a two-count indictment for conspiracy to defraud the United States, 18 U.S.C. § 371, and conspiracy to launder money with funds derived from wire fraud, id. §§ 1956(a)(1)(B)(i), 1956(h). Jim Glenn also was indicted for being a government employee who had participated in a contract in which he had a financial interest. Id. §§ 208, 216(a)(2). The three men pleaded not guilty.

13

*B. The Trial*

After the prosecution rested, both Brian Glenn and McCoy moved for a judgment of acquittal. Brian Glenn argued that he had worked for Finbar; the government had failed to prove he knew about the conspiracy to hide the true ownership of Finbar or that he had dealt unfairly with Matrix; and the checks he had written his father were in repayment of a loan to Finbar. McCoy argued that the government failed to prove it had been defrauded or that it did not receive services for its payments. The district court denied the motions.

During a conference about jury instructions, the government said it considered Tony Adessa, a witness for the defense, an unindicted coconspirator. The government explained that Adessa had not been charged by the grand jury, but that any statements he made during the trial could be used against him in the ongoing grand jury investigation. The government asked the district court to read Adessa his rights before he testified for the defense, and McCoy asked the district court to appoint counsel for Adessa. Both McCoy and Brian Glenn objected to what they considered to be late notice by the government. When the government responded that it had received a witness list from the defense that morning, McCoy responded that he had told the government that Adessa would be a defense witness the day the jury was selected. After a recess, Adessa took the stand and invoked

14

his privilege not to testify.  Brian Glenn later moved for a mistrial on the same ground, which McCoy joined.  The district court found that the government provided timely notice and denied the motions for mistrial.

Brian Glenn, Jim Glenn, and McCoy testified in their defense.  Brian Glenn testified that Matrix contacted Finbar to work as a subcontractor on a system to track parolees.  Brian testified that he had been concerned about a potential conflict and discussed the matter with McCoy and his father, Jim Glenn, who had told Brian that superior officers at the Center said Finbar could work for Matrix.  Brian stated that he completed his work and delivered workable products to the Systems project.  Brian alleged that Finbar provided other services for Matrix independent of the Systems project.

McCoy testified that he was friends with Jim Glenn.  McCoy said that he did not know that he had been listed as a director of Finbar, but he was not surprised because he had discussed mentoring both Jim and Brian Glenn.  McCoy said Matrix hired Finbar for legitimate reasons and believed its invoices were billed properly to the Center.  McCoy denied any direct participation in Finbar.

Jim Glenn denied any wrongdoing.  He testified that Donna Lohr was his girlfriend and both she and her daughter had worked for Finbar.  Jim explained that Donna Lohr had loaned Finbar money and the company had reimbursed her.  On

15

cross-examination, Jim said that he listed McCoy as a director of Finbar as a joke. Jim explained that he knew Matrix intended to subcontract with Finbar, but he was not privy to any agreement between the two companies.

In rebuttal, the government called two employees who had worked for the Center. Linda Ward testified that Jim Glenn had told her not to inventory some equipment and furniture that the Center had ordered for the Matrix office in Pensacola. Katherine Winter testified that she had called the Matrix office and the receptionist answered the phone, "Finbar Technologies." When Winter inquired about Matrix, the receptionist said, "This is Matrix, too."

The defendants renewed their motions for a judgment of acquittal, which the district court denied. During its charge, the district court instructed the jury about the elements of money laundering, but the court did not define the offense of wire fraud. There were no objections to the jury charge.

The jury found Jim Glenn, Brian Glenn, and McCoy guilty of conspiracy to defraud the United States, 18 U.S.C. § 371, and conspiracy to launder money with funds derived from wire fraud, id. §§ 1956(a)(1)(B)(i), 1956(h). Both Brian Glenn and McCoy moved for a new trial on the ground that the evidence was insufficient to support their convictions. McCoy also argued that the government denied him a fair trial by naming Adessa as an unindicted coconspirator. The district court

16

denied both motions. The district court sentenced McCoy to concurrent sentences of 13 months of imprisonment and three years of supervised release and Brian Glenn to concurrent sentences of nine months of imprisonment and three years of supervised release.

## II. STANDARDS OF REVIEW

We apply three standards of review in this appeal. We review de novo the denial of a judgment of acquittal, and we construe the evidence in the light most favorable to the government. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). "[J]ury instructions that are challenged for the first time on appeal are reviewed for plain error." United States v. Felts, 579 F.3d 1341, 1343 (11th Cir. 2009). We review the denial of a motion for a new trial for abuse of discretion. United States v. Lee, No. 08-14724, slip op. at 12 (11th Cir. Oct. 26, 2009).

## III. DISCUSSION

This appeal presents several issues. Both McCoy and Glenn argue that the government failed to prove the charges against them. McCoy also argues that the district court should have instructed the jury about the elements of wire fraud when explaining the elements of money laundering, and McCoy argues that he was entitled to a mistrial because the government waited unreasonably to disclose that Adessa was an unindicted coconspirator. These arguments fail.

17

*A. The District Court Did Not Err By Denying McCoy and Glenn's Motions to Acquit.*

Our review of the sufficiency of the evidence is divided in two parts. First, we address the evidence that McCoy and Glenn conspired to defraud the United States. Second, we address the evidence that they conspired to launder money.

*1. There is Sufficient Evidence That McCoy and Glenn Conspired to Defraud the United States.*

Sufficient evidence supports McCoy's and Brian Glenn's convictions for conspiring to defraud the United States. The evidence established that McCoy and the Glenns created a web of transactions to conceal from the government that Matrix had subcontracted work to Finbar and that McCoy and Jim Glenn had financial interests in those companies. McCoy and Jim Glenn transferred to Brian Glenn ownership and control of Finbar, after which Jim Glenn awarded work to Matrix with the knowledge that McCoy would subcontract the work to Finbar. Finbar, through Brian Glenn, billed Matrix, and McCoy invoiced the System project for work not performed, performed unsatisfactorily, and for extraneous work. Jim Glenn approved payment of those invoices, and the government wired payment to Matrix, which, in turn, wired payment to Finbar. The jury was entitled to infer that McCoy, Jim Glenn, and Brian Glenn knew it was impermissible for Matrix to subcontract work to Finbar, the three men misrepresented to the

18

government that Matrix would perform the work, and the three men failed to provide the government the services for which it paid.

McCoy argues that he cannot be guilty of defrauding the government because it received services from Finbar, but we disagree. McCoy defrauded the government by concealing that the work that was to be performed by Matrix was instead performed by Finbar. McCoy also defrauded the government by concealing his and Jim Glenn's financial interest in Finbar, overcharging the government for services, and charging for services not rendered.

Brian Glenn argues that the government failed to prove he knew about or joined in the conspiracy, but we disagree. Jim Glenn awarded contracts to Matrix expecting McCoy to use Finbar as a subcontractor, Matrix paid Finbar substantially more than it invoiced, and Brian Glenn, in turn, distributed those funds to his father and McCoy. A jury could reasonably infer that Brian accepted control of Finbar to conceal his father's financial interest in the company; concealed from the government that Finbar was performing work expected of Matrix by submitting invoices to and receiving payment from Matrix; and billed the government repeatedly for work that was unsatisfactory, extraneous, or not performed. Brian decided to testify and ran the risk that, if disbelieved, the jury could consider his testimony as substantive evidence of his guilt. United States v.

19

Brown, 53 F.3d 312, 314 (11th Cir. 1995).  The jury was entitled to discredit Brian's testimony that he had received assurances that the transactions were legal when those assurances were given by his own father and McCoy, who also were interested parties.  See United States v. Williams, 390 F.3d 1319, 1323, 1325–26 (11th Cir. 2004).

*2. There is Sufficient Evidence That McCoy and Glenn Also Conspired to Launder Money.*

The government also submitted sufficient evidence for the jury to conclude that McCoy and Brian Glenn conspired to launder money.  To establish the two men conspired to launder money, the government had to prove the men knowingly participated in an agreement to conduct a financial transaction involving proceeds of an unlawful activity with knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.  United States v. Martinelli, 454 F.3d 1300, 1310 (11th Cir. 2006).  Finbar, through Brian Glenn, submitted to Matrix fraudulent invoices that Matrix, through McCoy, charged to the government.  Jim Glenn approved payment of those fraudulent invoices and funneled money received by Matrix to Finbar, which Brian Glenn distributed to his father, associates of his father, and McCoy.

*B. The District Court Did Not Plainly Err in Its Instruction About Money Laundering.*

McCoy argues for the first time on appeal that the district court was required to instruct the jury about the elements of wire fraud because it was an "essential term within the scope of the indictment," but we disagree. McCoy was not charged with wire fraud and the government was not required to prove that offense to convict him of conspiring to launder money. See Martinelli at 1311. Because "[t]he jury was fully instructed on the elements of conspiring to launder money," and the district court told the jury that McCoy "had to know the proceeds were derived from the specified unlawful activity of [wire] fraud . . . . the absence of instructions on the elements of [wire] fraud, which were not elements of the charged crime, did not affect [McCoy's] rights." Id. at 1312. The district court did not plainly err by failing to instruct the jury about the elements of wire fraud.

*C. McCoy Was Not Entitled To a New Trial.*

The district court did not abuse its discretion by denying McCoy's motion for a new trial. McCoy had the right to call witnesses in his defense, but Tony Adessa was entitled to notice about and the opportunity to invoke his Fifth Amendment privilege against self-incrimination. See United States v. Cuthel, 903 F.2d 1381, 1384 (11th Cir. 1990). The government did not interfere substantially with McCoy's right to compulsory process when it told the district court that

21

Adessa was an unindicted coconspirator and requested that the court instruct Adessa about his right to remain silent.  See United States v. Terzado-Madruga, 897 F.2d 1099, 1108 (11th Cir. 1990).

## IV. CONCLUSION

The convictions of Gerald McCoy and Brian Glenn are **AFFIRMED**.